DELTA BANK ET AL. *v.* OLIVER-FINNIE GROCERY COMPANY ET AL.

1. FRAUDULENT CONVEYANCE.    *Notice to vendee.*    *Collusion.*    *Trust.*

     Where an insolvent merchant, through the co-operation of the president of a bank, in falsely representing him to be solvent, was enabled to make unusually large credit purchases of goods, and soon thereafter sold all of his assets to the bank, in consideration of a small sum in cash and a large debt to it, and the president, who acted for the bank, knew that the purpose of the debtor, throughout, was to defraud his other creditors, the sale will be void, and, on a bill filed by such other creditors, the bank will be held a trustee for complainants of the property so acquired.

2. SAME.    *Fraudulent vendee.*    *Measure of liability.*    *Creditors' bill.*

     In such case, it is error to render a decree against the bank absolutely for the price agreed on for the goods between it and the debtor. It is answerable only for the fair value of the assets so acquired and disposed of by it, and the property still on hand should be sold under the decree.

3. FRAUDULENT VENDEE.    *Bank.*    *Personal liability of agent.*

     It is also error in such case to render a decree against the president of the bank personally. His acts are to be deemed the acts of the bank; it, having received the benefit, should alone be charged as trustee.

FROM the chancery court of Leflore county.

HON. W. R. TRIGG, Chancellor.

This is a bill filed by certain creditors of Harry Lee, a merchant, to set aside a conveyance of his entire stock of merchandise, his real estate and all other assets to the Delta Bank, of Greenwood. The bill was filed against said bank and J. S. McDonald, its president, and John K. Otley, and seeks to hold them personally liable to complainants, the bank to the extent of the value of the property conveyed, and McDonald and Otley to the extent of the entire sum of complainants' debts.

The bill alleges that McDonald and Otley were secret partners with Lee in the mercantile business out of which com-

plainants' debts arose, and sought, as such, to hold them personally liable. But the evidence failed to sustain this charge, and the bill, so far as it sought to hold Otley liable, was abandoned. The bill also alleged that when the conveyance was executed, and the debt to the bank created, the privilege tax paid by it was inadequate, and, further, that it had no power, under its charter, to take the conveyance. There was no proof introduced in support of these allegations, and, as the points are not argued in this court, it is not necessary to further notice them.

The right to relief is mainly predicated on the allegations that Lee made the conveyance with intent to defraud his creditors other than the bank, and that the bank had notice of his fraudulent intent; that when Lee was purchasing goods from complainants, the bank, through its president, McDonald, falsely represented that he was solvent and reliable, the purpose of both being that Lee should accumulate a large stock of goods, which he would turn over to the bank, and thus defraud complainants and other creditors, and that the sale to the bank was made as the culmination of such fraudulent scheme.

The answers of the defendants expressly denied all the allegations of the bill charging fraud or collusion. The record is very voluminous, but it is unnecessary, in view of the opinion, to state in detail the evidence, which was conflicting. It was shown that the aggregate of the indebtedness due by Lee to the complainants, nearly all of which was contracted just prior to the sale to the bank, exceeded $12,000. It was further shown that Lee was a young man and unmarried; that he came to Greenwood about a year before, having previously lived in Greenville; that McDonald had also lived in Greenville, and, both in that city and in Greenwood, had been on intimate terms with Lee; that in 1889 Lee, McDonald and Otley engaged in selling coal, operating under the name of Harry Lee & Co., but this business amounted to little, and was soon discontinued; that in November, 1889,

Lee embarked in a small mercantile business, having a capital of $3,000, which was loaned to him by McDonald personally upon collaterals. About that time Lee, McDonald and Otley (McDonald being the president and Otley the cashier of the Delta Bank) conceived the plan of embarking as partners in a mercantile, brokerage and plantation supply business, but nothing definite was done, and, meantime, Otley went to Virginia on account of ill health, and did not return, and resigned his position in the bank. The plan for this partnership contemplated that the business should be done under the name of Harry Lee & Co., with Lee as manager, and was to be conducted in a store-house adjoining the Delta Bank building, and with an opening between the bank and the store-room. As stated, this scheme was abandoned, but Lee opened business in his own name in another store-house adjoining the bank, and constructed in a style similar to that which had been agreed on. As stated, Lee obtained the $3,000 capital for this business from McDonald, to whom he executed his note for that amount. The business thus begun was continued until early in the fall of 1890, during which time the stock of goods kept on hand ranged in value from $1,500 to $2,500, and this was shown to be sufficient for the business. During the fall of 1890, and up to November 24, the day of the sale to the Delta Bank, Lee had increased his stock of goods on hand until it inventoried $12,533. During the year he also had a retail whisky saloon which he carried on. The amount of stock carried in his whisky business rarely, if ever, exceeded $1,000. Lee also rented a hotel, and managed that in connection with his grocery store and saloon. The bill alleges that, up to the fall of 1890, Lee's business was profitable, and it was shown that during that year he built a residence, which he rented out. The evidence is conflicting as to where he obtained the money for this purpose, whether by a loan obtained from McDonald, or from the profits of his business.

The evidence showed that McDonald and Lee were inti-

mate friends; that the former was frequently in the store, and in consultation with Lee; that Lee transacted all his banking and exchange business through the Delta Bank, and required all drafts connected with his business to be drawn through it; that McDonald, in the name of the bank, had frequently represented him to be solvent and reliable, and Lee was accustomed to refer creditors to the bank for reports as to his financial standing. Many letters, written by McDonald, in the name of the bank, to wholesale dealers, were introduced in evidence, and in all of them Lee was rated as prompt and solvent, and the letters were such as would be calculated to induce extension of credit to him. During all of this time, the books of the bank showed that Lee was largely indebted to it, and, among other debts held by the bank, was the $3,000 note above mentioned in favor of McDonald, which McDonald had indorsed to the bank. It was shown that many advances made by the bank to Lee were, in fact, made to and in the discharge of his indebtedness, and, on several occasions in the fall of 1890, the bank, through McDonald, made advances to Lee to save him from threatened attachments. It was shown that, on or about November 1, 1890, the bank advanced to Lee $4,000 at one time, upon Lee's representation that it was sufficient to pay all his indebtedness, and his promise to so use it. The bank held certain paper as collateral to secure the indebtedness due by Lee; but, shortly before the sale, permitted him to withdraw it all in order that the collaterals might be renewed, but the securities were never replaced. As a temporary expedient to secure the debt to the bank while these collaterals were in Lee's hands, he gave to McDonald a bill of sale of his entire stock of goods, but this was not made public.

It was shown in behalf of the defendants that, at the time Lee began to expand his business, and until a short time before his failure, the town of Greenwood was growing rapidly, both in population and in its business; that it was the center of great business activity; that many houses were being

built, and every thing gave promise of rapid and permanent growth for the town, and that, in thus enlarging his business and extending his operations, Lee was but following the example of many others; that in the fall of 1890 the town suffered a collapse, and that Lee, along with many others, was one of its victims. It was further shown that when McDonald realized that Lee was hopelessly embarrassed, and that he also deceived the bank as to the return of the collaterals, he consulted the attorney of the bank, who advised him that the bill of sale, taken to secure the return of the collaterals, was a nullity, and, further, that there was no ground of attachment; that, in this emergency, as the debt to the bank amounted to about $13,000, it was agreed between the bank and Lee that it would purchase his entire stock of groceries and liquors, and all his real and personal estate of every kind (which inventoried $17,353) for $14,000, the difference between the price thus agreed upon and the indebtedness to the bank, namely, $1,000, was paid to Lee in cash, and the purchase was consummated, and the bank took possession. It is unnecessary to set out all the facts and circumstances in evidence relied on by the complainants and defendants touching the question of the fraudulent intent of Lee, and McDonald's alleged co-operation and collusion with him. The court below held the sale to the bank to be fraudulent; that the bank, through its president, McDonald, had notice of the fraud, and participated in it. The decree recites the amount of the indebtedness due by Lee to the several complainants, and was against Lee, the bank and McDonald for the said amounts, being, in the aggregate, over $12,000; but the recovery against the bank was, in no event, to exceed the net price of the personal assets as agreed upon between the bank and Lee in the sale. The decree further ordered that the real estate embraced in the transfer to the bank be sold in satisfaction of the decree. From this decree McDonald and the bank have appealed.

Inasmuch as the briefs and arguments of counsel deal al-

most exclusively with the issues of fact involved, they are omitted.

*A. H. Longino* and *Mayes & Harris*, for appellants.

*Rush & Gardner* and *J. E. Gwin*, for appellees.

Argued orally by *A. H. Longino* and *E. Mayes*, for appellants, and by *W. T. Rush* and *J. E. Gwin*, for appellees.

CAMPBELL, C. J., delivered the opinion of the court.

The decree must be reversed. It is not warranted by the pleadings and proof. The only aspect in which the bill is maintained is that the bank, by reason of the action of McDonald, in co-operation with Lee, was disabled to become the grantee, as against Lee's creditors, of his assets. The conclusion is irresistible that Lee's purpose was to defraud, and that the bank, through McDonald, is chargeable with notice of this design; and because of this, the bank was not a *bona fide* purchaser. Hence, the bank is to be held answerable to Lee's creditors for what it got by his fraudulent conveyance.

But the decree was improperly rendered against McDonald. He was, as to the transaction with Lee, the bank, and, because of this, the bank, not he, is chargeable, as trustee, of what was conveyed to it by Lee.

The decree is wrong in fixing the value of the property conveyed by Lee at the price agreed on between Lee and the bank, in view of the evidence that it was worth less. All that the bank is answerable for is the just value of property it disposed of, and property yet on hand may be decreed to be sold.

*Decree reversed, and cause remanded, with direction for a decree to be made in accordance with this opinion, unless the complainants will take a decree here, as they may, for the sum shown by the evidence to have been realized by the bank from the assets conveyed by Lee to it, and for the sale of property in its hands, derived from Lee, not disposed of by it.*